# In the United States Court of Federal Claims

No. 18-978C (Pro Se)
(Filed: January 25, 2019)

| | |
|---|---|
| RICHARD A. CHICHAKLI, <br><br>  Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br>  Defendant. | Keywords: Pro Se; Motion to Dismiss; Takings Clause; IEEPA; Economic Sanctions; Executive Order 13348 |

*Richard A. Chichakli*, Plano, TX, pro se.

*Ann C. Motto*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Tara K. Hogan*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, J.**

Plaintiff Richard A. Chichakli, appearing pro se, brings this action against the United States alleging that the Department of the Treasury, the Department of Justice, and other federal entities appropriated his personal property in violation of various federal regulations and several constitutional provisions, including the Fifth Amendment's Takings Clause. His allegations arise out of an April 2005 decision by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") classifying Mr. Chichakli as a "Specially Designated National" ("SDN") pursuant to Executive Order 13348 ("EO 13348" or "the Order"). Treasury based the designation decision on Mr. Chichakli's affiliation with Victor Bout, a Russian national and known arms and minerals trafficker.

As a consequence of the designation, OFAC blocked all of Mr. Chichakli's funds, accounts, business records, and assets and seized a number of items from his home. Among the items taken during the seizure were various valuables including diamonds, gold, cash, foreign currency, bank notes, original art, and personal vehicles. Mr. Chichakli unsuccessfully challenged his designation before OFAC and in federal court. Though the sanctions against Mr. Chichakli were effectively lifted as a result of a November 2015 executive order, his assets were not returned to him until May 2017.

Mr. Chichakli filed the present lawsuit on July 9, 2018, alleging, among other things, that not all of his property was returned and that the eighteen-month delay between OFAC's release and return of the assets constituted a taking without just compensation in violation of the Fifth Amendment. Mr. Chichakli also alleges that the seizures of his property violate EO 13348 and affiliated regulations. He further claims that the government officials "plundered" several items which were not returned to him and that they deliberately caused other items to lose value.

Presently before the Court is the government's motion to dismiss. It argues that the Court lacks jurisdiction over most of Mr. Chichakli's complaint because none of the sources of law on which he bases his claims—other than the Fifth Amendment's Takings Clause—are money-mandating. It further argues that Mr. Chichakli has failed to state a viable claim under the Takings Clause because his property was not taken for public use.

For the reasons set forth below, the Court agrees with the government. Accordingly, the government's motion to dismiss is **GRANTED**.

## BACKGROUND[1]

### I. The International Emergency Economic Powers Act and Executive Order 13348

In two resolutions, dated December 22, 2003 and March 12, 2004, the United Nations Security Council ("the UNSC") established "a sanctions program, including both travel restrictions and an asset freeze, related to Charles Taylor, his inner circle, and those supporting actions and policies of his regime." Decl. of Adam J. Szubin ("Szubin Decl."), Compl. Ex. 14, ¶ 19, Docket No. 1-2; see also S.C. Res. 1521 (Dec. 22, 2003); S.C. Res. 1532, (Mar. 12, 2004).[2] Shortly thereafter, in June 2004, the Liberia Sanctions Committee of the UNSC announced a list of twenty-three individuals who would be subject to an asset freeze. Szubin Decl. ¶ 19. Accordingly, the United States "had an international law obligation to freeze any assets of those persons subject to United States jurisdiction." Id.

In response to the actions of the UNSC, President George W. Bush relied on the broad powers granted to him under the International Emergency Economic Powers Act ("IEEPA"). IEEPA grants the President broad powers to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy . . . if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a); see also Szubin Decl. ¶ 6.

---

[1] The facts set forth in this section are based on the allegations in Mr. Chichakli's complaint, which the Court assumes are true for purposes of deciding the government's motion to dismiss, as well as on jurisdictional facts drawn from any additional documents submitted by the parties.

[2] The Declaration of Adam Szubin was provided by Mr. Chichakli as an exhibit to his complaint. The declaration was filed in a lawsuit brought in the United States District Court for the Northern District of Texas challenging his classification as an SDN. Mr. Szubin was OFAC's Director at the time the declaration was submitted.

Pursuant to his authority granted by IEEPA, President Bush issued EO 13348 in July 2004, declaring a national emergency in response to "the actions and policies of former Liberian President Charles Taylor and other persons . . . [which] undermined Liberia's transition to democracy and the orderly development of its political, administrative, and economic institutions and resources." Exec. Order No. 13348, 69 Fed. Reg. 44,885 (July 22, 2004). The President declared that "all property and interests in property of [relevant] persons, that are in the United States . . . are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." Id. EO 13348 applied to "the persons listed in the Annex to this order" and any person "determined by the Secretary of the Treasury, in consultation with the Secretary of State . . . to have materially assisted, sponsored, or provided financial, material, or technological support" to any such individual. Id. Though Mr. Chichakli was not named in the Order, Viktor Bout—listed as a "businessman, dealer and transporter of weapons and minerals"—appeared in the Order's annex. Id. at 44,888.

President Bush authorized the Secretary of the Treasury to promulgate rules and regulations and "to employ all powers granted to the President by IEEPA and [the United Nations Participation Act, 22 U.S.C. § 287c] as may be necessary to carry out the purposes of [EO 13348]." Id. at 44,886.

## II. Mr. Chichakli's SDN Designation and the Seizure of His Property

Mr. Chichakli is a United States citizen who currently resides in Plano, Texas. In 1995, Mr. Chichakli worked as "an economic advisor to a head of state in the United Arab Emirates (UAE), [where he was] appointed to create a 100,000,000 Square Feet [] 'Free Economic Trade Zone' in the State of Sharjah-UAE." Compl. ¶ 15, Docket No. 1. It was during this time that Mr. Chichakli met Viktor Bout, whom he describes as an "alleged arms trafficker" and "person of interest to the United States." Id.[3]

Viktor Bout is a Russian national who had a number of firms that were "tied to several major arms shipments to Liberia." Szubin Decl. ¶ 22. He was known "by media sources as the most prolific 'sanctions buster' and weapons trafficker in areas where international arms embargoes [were] imposed on one or both sides in regional conflicts." Id. Mr. Chichakli developed a close working relationship with Mr. Bout. Id. ¶ 25; see also Compl. ¶ 16. In fact, "Mr. Chichakli ha[d] been an integral part of the Bout network for many years . . . [including] his extensive management and coordination of activities for Air Cess, Air Pass, and Centrafrican Airlines, all prominent companies in the Bout network." Szubin Decl. ¶ 25. Mr. Chichakli "has also established and registered in the United States several companies that [were] essential components in the Bout network and its provision of weapons and other materials and services to numerous regimes, including that of Charles Taylor in Liberia." Id.

---

[3] Viktor Bout is more than an "alleged" trafficker or "person of interest."; he has been convicted of four counts related to a "conspiracy to sell 100 surface-to-air missiles to the Colombian terrorist group Fuerzas Armadas Revolucionarias de Colombia" and sentenced to 300 months in prison after a trial by jury in the United States District Court for the Southern District of New York. United States v. Bout, 666 F. App'x 34, 36 (2d Cir. 2016).

It was Bout's connection with Charles Taylor, the President of Liberia from 1997 to 2003, that sparked the U.S. government's interest in Mr. Chichakli. See id. ¶¶ 23, 25–26. Following an investigation into Mr. Bout's network, OFAC classified Mr. Chichakli as an SDN and, on April 26, 2005, blocked the funds, accounts, and business records belonging to him and to ten companies under his control. See id. ¶ 23, 26; Compl. ¶ 17. That same day, as part of a separate criminal matter, FBI agents executed a search warrant at Mr. Chichakli's home in Richardson, Texas. Szubin Decl. ¶ 27. Accompanying the agents were two OFAC officers, along with individuals from the Internal Revenue Service, Immigration and Customs Enforcement, and the Dallas Police Department. Id. Federal personnel, including the two OFAC officers, also executed a warrant at Mr. Chichakli's place of work (also in Richardson, Texas) and at the home of his secretary in Plano, Texas. Id. ¶ 28. Pursuant to the warrants and blocking order, the government "took [Mr. Chichakli's] home, his vehicle, monies, and bank accounts [and] blocked [his] business assets. . . [including] funds in several banks, accounts receivable, vehicles, passenger and cargo airplanes, airplane[] engines and spare parts, inventory of cut and polished diamonds, business equipment and furniture, and collection of original arts." Compl. ¶ 19.

According to Mr. Chichakli, he sought an inventory from OFAC and the FBI "as soon as the blockage took place" but did not receive one until 2013. Id. ¶ 24–25. Apparently, however, the Inspector General conducted an inventory of the assets on May 22, 2007. See id. ¶ 29.

Due to the extent of the sanctions against him, Mr. Chichakli left the United States on May 2, 2005. Id. ¶¶ 20–21. He unsuccessfully challenged his SDN designation and the freezing and seizure of his assets, first before OFAC, then before the United States District Court of the Northern District of Texas and, finally, the United States Court of Appeals for the Fifth Circuit. See Szubin Decl. ¶ 30–39; Chichakli v. Szubin, 546 F.3d 315, 317 (5th Cir. 2008) (finding that "exigent circumstances justif[ied] the holding of a hearing only after Chichakli's assets were frozen").

### III. Mr. Chichakli's Arrest, Prosecution, and Detention

An indictment against Mr. Chichakli was issued on January 2, 2013, alleging that "he conspired to violate the political economic sanction imposed upon him pursuant to Executive Order [13348]." Compl. ¶ 23. INTERPOL arrested Mr. Chichakli in Australia on January 9, 2013. Id. He was tried, convicted, and sentenced to five years imprisonment in the United States District Court for the Southern District of New York in 2014. Id. ¶ 23; United States v. Bout, 651 F. App'x 62, 63 (2d Cir. 2016).[4] Mr. Chichakli was released from prison in February 2017. Compl. ¶ 23.

### IV. OFAC Returns Seized Items

The sanctions against Mr. Chichakli were effectively lifted as a result of Executive Order 13710. 80 Fed. Reg. 71,679 (Nov. 12, 2015). Mr. Chichakli was still incarcerated when his assets

---

[4] He was convicted of nine counts: one count of conspiracy to engage in business practices prohibited by IEEPA; one count of conspiracy to commit money laundering; one count of conspiracy to commit wire fraud; and six counts of wire fraud. See Bout, 651 F. App'x at 63.

were released. Compl. ¶ 28. In his complaint, Mr. Chichakli states that OFAC refused to release his property to his daughter and former spouse while he was in prison. Id. ¶ 56. However, in January 2017 OFAC returned a motorcycle and car to a Gloria Catha (who the Court understands to have been his wife). Pl.'s Resp. to Def.'s Mot. to Dismiss ("Pl.'s Resp.") Ex A, at 1, Docket No. 13. Furthermore, OFAC had been in contact with Ariel Aponte to return the seized items until Mr. Chichakli requested that the items be returned directly to him on April 3, 2017. Id.

Though not all of Mr. Chichakli's correspondence with OFAC is in the record, the Court understands that on May 16, 2017, OFAC returned all of Mr. Chichakli's property, excluding the disputed items in this case, to Mr. Chichakli, who was then in Dallas. Compl. Ex 12. In a return receipt provided to Mr. Chichakli by OFAC (which he signed), the agency specified that it had returned: five evidence bags containing various amounts of U.S., Russian, Australian, and E.U. currency; the keys to a car, a home in Plano, Texas, an office suite, and a mailbox; and thirty-two bags of material containing various diamonds, diamond cutting tools, gold coins, jewelry, etc. Id. Mr. Chichakli noted on the receipt that three items had not been returned: "a $1,000 bill (1934)," a "[r]ing with clear gem," and a "[g]old chain with pendant." Id. (listed as items 33–35 on OFAC's "Receipt for Returned Property B").

In a January 10, 2018 letter, Mr. Chichakli asserted that these items were valued in excess of $10,000. Compl. Ex. 13. He further claims that the diamonds listed in Item 32 on the return receipt (described as "containing 5 diamond papers with one round diamond in each," Compl. Ex. 12) had been swapped with stones of lesser value. Id. He alleged that "OFAC and [the] governments' [sic] agent took (9) stones with a total weight of 8.2 carats of diamonds and replaced it with 5-stones with total weight of 1.04 carats." Compl. Ex. 13. He further noted that "more than 19-Carats of diamonds with a total value of nearly US $45,000 [were] missing." Id. OFAC acknowledged receipt, but no response to this January 10, 2018 correspondence is contained in the record. See id.

In his complaint, Mr. Chichakli also claims that a number of other valuables were not returned to him, including $40,000 in cash, "the proceed[s] from the sale of two real estate properties that were blocked in 2005 . . . more than $80,000 in accounts receivable and [an] unknown sum of money defendant receive[d] from the sale of [Mr. Chichakli's] business assets." Compl. ¶ 37. Mr. Chichakli identified these discrepancies by comparing the items in OFAC's return receipt with the Office of the Inspector General inventory conducted in 2007. Id. ¶ 33; Compl. Ex. 10 (Inspector General 2007 inventory).

## V.     The Present Dispute

Mr. Chichakli filed the present lawsuit in this court on July 9, 2018. Docket No. 1. He identifies three causes of action.

First, he asserts that the United States government has "stolen, embezzled, plundered, or otherwise illegally took, and failed to return" certain valuables in violation of 31 C.F.R. §§ 593.201, 504, 601, 603 and EO 13348. Compl. ¶¶ 44–45. These valuables include: "diamonds with an estimated value in excess of [$100,000]"; "cash and disregard [sic] of [$1,000,000] including revenues from disposal of plaintiff's real properties"; "U.S. and Foreign collectible currencies and bank notes valued at more than [$70,000]"; "business accounts receivable of

5

approximately $80,000"; "[m]ortgage note receivable of more than $20,000"; "original arts from Plaintiff's public accounting Office with verifiable acquisition value of $320,000"; and "$45,000 in jewelry, gold, and other property." Compl. ¶ 44.

Next, Mr. Chichakli alleges that the United States government "deliberately caused the lo[s]s of economic value of plaintiff's monetary asset[s] of nearly one million dollars in cash deposits at various US banking institution[s] by failing its [obligation] to place Plaintiff's blocked fund in an interest-bearing account" as required by law. Id. ¶ 49. He also alleges that the United States has "intentionally destroyed the blocked assets of Plaintiff by irrationally disposing all of the income generating blocked property; namely, the rental properties held" and by storing a $110,000 vehicle unprotected in the "Texas sun" for twelve years. Id. ¶ 50. Such actions, according to Mr. Chichakli, constitute violations of 31 C.F.R. §§ 593.201, 203, 504, 601, 603 and EO 13348. Id. ¶ 51.

In his third cause of action, Mr. Chichakli alleges that OFAC's eighteen-month delay in returning his property (between the unblocking of his assets in November 2015 and their return in May 2017) violated his constitutional rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Compl. ¶¶ 55, 57.

Mr. Chichakli asks the Court to find that the government violated his constitutional rights and 31 C.F.R. § 593.203 (requiring that any person holding blocked funds keep them in interest-bearing accounts). Compl. ¶ 59b–c. He requests $1,650,000 "in addition to 18-month interest on the said principal . . . and further damages for defendant's failure to comply with 31 C.F.R. §[]593.203 which obligate[s] the defendant to hold blocked funds in interest-bearing accounts." Id. ¶¶ 60–61.

The government filed a motion to dismiss on November 6, 2018 (Docket No. 11), arguing that this Court lacks jurisdiction over most of Mr. Chichakli's claims because they present either tort claims or claims that are not based on money-mandating sources of law. Def.'s Mot. to Dismiss ("Def. Mot.") at 10–12. The government further argues that though the Court has jurisdiction to adjudicate Mr. Chichakli's Fifth Amendment takings claim, he fails to state a claim upon which relief can be granted because his allegations do not support a claim that his property was taken for public use. Id. at 12–17. The Court agrees with the government. Accordingly, Mr. Chichakli's complaint must be **DISMISSED**.

## DISCUSSION

### I. The Court Lacks Jurisdiction over All of Mr. Chichakli's Claims Except His Fifth Amendment Takings Claim

In considering a motion to dismiss for lack of subject-matter jurisdiction, the Court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The Court may, however, "inquire into jurisdictional facts" to determine whether it has jurisdiction. Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991). It is well established that complaints filed by pro se plaintiffs are held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). Nonetheless, even

pro se plaintiffs must persuade the Court that jurisdictional requirements have been met. Harris v. United States, 113 Fed. Cl. 290, 292 (2013).

The Tucker Act provides that the Court of Federal Claims "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). It is well established that the Tucker Act—a jurisdictional statute—"does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Thus, a plaintiff must identify a separate money-mandating source of substantive rights to establish the court's jurisdiction. See Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

The first and second counts of Mr. Chichakli's complaint are beyond this Court's jurisdiction under the Tucker Act because they allege the commission of intentional torts by officials of the United States. Mr. Chichakli claims that the government has "stolen, embezzled, plundered, or otherwise illegally [taken]" his property, "deliberately caused the lo[s]s of economic value of plaintiff's monetary asset[s]," and "intentionally destroyed the blocked assets of Plaintiff by irrationally disposing all of the income generating blocked property." Compl. ¶¶ 44, 49–50. "The plain language of the Tucker Act excludes from the Court of Federal Claims jurisdiction claims sounding in tort." Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008). Accordingly, these claims must be dismissed.

The Court also lacks jurisdiction over Mr. Chichakli's claims alleging a breach of various federal regulations issued pursuant to EO 13348 because those regulations cannot "fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties they impose." United States v. Mitchell, 463 U.S. 206, 219 (1983); see also Testan, 424 U.S. at 400 (observing that entitlement to money damages "depends upon whether any federal statute can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained") (internal quotation marks and citations omitted). The regulations Mr. Chichakli cites cannot be so interpreted because they do not impose obligations on the United States, but rather upon the persons or institutions holding the blocked funds. See 31 C.F.R. § 593.203(a) (2015) (requiring "any U.S. persons holding funds" to place seized assets in an interest bearing account located in the United States); 31 C.F.R. § 593.504 (2015) (requiring that any payment or transfer of any blocked funds "must be blocked in an account on the books of [a] financial institution"); 31 C.F.R. § 593.601 (2015) (noting that "[r]ecordkeepings and reporting requirements imposed by part 501 of this chapter . . . are considered requirements arising pursuant to [part 593]").[5]

Further, Mr. Chichakli's claims brought under the Fourth and Fourteenth Amendments are also not within this Court's jurisdiction under the Tucker Act because these provisions "do not mandate payment of money by the government." LeBlanc v. United States, 50 F.3d 1025,

---

[5] Mr. Chichakli also claims that the government has violated 31 C.F.R. § 593.603. Compl. ¶ 51. There is currently no such regulation, nor did such a regulation exist when these sanctions were in effect.

7

1028 (Fed. Cir. 1995); see also Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997) ("[T]he Fourth Amendment does not mandate the payment of money for its violation."). As such, these claims must also be dismissed.

Finally, Mr. Chichakli also asserts a violation of his rights under the Fifth Amendment's Takings Clause. See Compl. ¶¶ 54–55. This Court has jurisdiction over such allegations under the Tucker Act. See Moden v. United States, 404 F.3d 1335, 1341 (Fed. Cir. 2005) (noting that the Fifth Amendment's Takings Clause is money-mandating). The Court turns now to the government's motion to dismiss under RCFC 12(b)(6), for failure to state a claim for relief under the Takings Clause.

## II. Mr. Chichakli Has Failed To State a Fifth Amendment Takings Claim

Mr. Chichakli claims that he is owed compensation under the Takings Clause based on the fact that his assets were retained for eighteen months after they were unblocked. See Compl. ¶¶ 54–55, 57. The government has moved to dismiss this claim pursuant to RCFC 12(b)(6). The Court agrees with the government that Mr. Chichakli has failed to state a claim for relief under the Takings Clause.

When considering a motion to dismiss for failure to state a claim under RCFC 12(b)(6), the Court accepts as true the complaint's undisputed factual allegations and construes them in the light most favorable to the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court draws all reasonable inferences in favor of the non-moving party, Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001), but the complaint's factual allegations still "must be enough to raise a right to relief above the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In other words, the plaintiff's claim must be "plausible on its face." Id. at 570; see also Acceptance Ins. Cos., Inc. v. United States, 583 F.3d 849, 853 (Fed. Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend V. "The clause does not entitle all aggrieved owners to recompense," however, "only those whose property has been 'taken for a public use.'" AmeriSource Corp. v. United States, 525 F.3d 1149, 1152 (Fed. Cir. 2008).

"Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." Id. at 1153. And the government's police power encompasses both the seizure of property for use as evidence in a criminal investigation and the taking of property pursuant to economic sanctions. See Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1332–33 (Fed. Cir. 2006) (finding that the forfeiture of imported counterfeit goods was "the kind of exercise of the police power that has repeatedly been treated as legitimate even in the absence of compensation to the owners of the [] property"); Paradissiotis v. United States, 304 F.3d 1271, 1274–75 (Fed. Cir. 2002) ("[V]alid regulatory measures taken to serve substantial national security interests . . . have not been recognized as compensable takings for Fifth Amendment purposes.").

In Paradissiotis, a case strikingly similar to this one, OFAC froze the assets of an SDN determined to be an agent of Libya. 304 F.3d at 1273. The court of appeals found that the freezing of that individual's assets in the first instance was not a taking for which the government was required to provide just compensation. Id. at 1275–76. There, as here, the President ordered the blocking of the individual's assets via executive order pursuant to his authority under IEEPA. Id. at 1272, 1275. The court reasoned, as it had done in past cases, that the imposition of the Libyan sanctions "substantially advance[d] the national security of the United States and that the frustration of contract rights resulting from the application of those [sanctions] does not constitute a Fifth Amendment taking." Id. at 1274 (citing Chang v. United States, 859 F.2d 893, 896–97 (Fed Cir. 1988); 767 Third Ave. Assocs. v. United States, 48 F.3d 1575, 1581 (Fed. Cir. 1995)). Indeed, the court of appeals noted, "[e]conomic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be compensated for the losses those sanctions caused them." Id. at 1275.

Mr. Chichakli's challenge to OFAC's delay in returning his blocked assets also does not state a claim under the Takings Clause. Because his claim "is predicated on the unlawfulness of the delay . . . the true nature of [that claim] is one for damages based on unlawful conduct by the government, not on a taking of private property for public use." Acadia, 458 F.3d at 1333. Such a claim may implicate a due process right "not to have property held . . . for an unreasonable time," but that is also a claim this Court lacks jurisdiction to adjudicate. Id. at 1333–34.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss the takings claim pursuant to RCFC 12(b)(6) is **GRANTED** and that claim is **DISMISSED**. The government's motion to dismiss the remainder of the claims in the complaint pursuant to RCFC 12(b)(1) is **GRANTED** and those claims are **DISMISSED without prejudice**. The Clerk shall enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

_____
ELAINE D. KAPLAN
Judge